UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ELLEN MCNUTT,                                    )
                                                 )
                    *Plaintiff*,                 )
                                                 )
          vs.                                    )        No. 1:23-cv-01540-JMS-MG
                                                 )
MYERS-HOLUM, INC.,                               )
                                                 )
                    *Defendant*.                 )

## ORDER

Plaintiff Ellen McNutt worked as a Team Lead at Defendant Myers-Holum, Inc. ("Myers-Holum").  When the project that Ms. McNutt billed most of her time to ended abruptly, Myers-Holum explored how to reallocate her to another project or another team, but due to the amount of work available for someone with her experience, Myers-Holum was unable to retain Ms. McNutt and made the decision to terminate her employment.  But before communicating its termination decision to Ms. McNutt, she inquired about leave under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA").  Ms. McNutt initiated this lawsuit against Myers-Holum, setting forth claims for discrimination under the Americans With Disabilities Act, 42 U.S.C. § 12181, *et seq.* ("ADA"), and retaliation under the FMLA.  [Filing No. 1.]  Myers-Holum has filed a Motion for Summary Judgment, [Filing No. 33],[1] which is ripe for the Court's consideration.

---

[1] Myers-Holum originally filed its Motion for Summary at Filing No. 28, but its filing did not comply with the Court's Practices and Procedures.  [Filing No. 7; Filing No. 32.]  The Court ordered Myers-Holum to re-file its exhibits and brief in compliance with the Court's Practices and Procedures.  [Filing No. 32.]  It has done so and has also re-filed its Motion for Summary Judgment.  [Filing No. 33; Filing No. 34.]  Accordingly, the Court **DENIES AS MOOT** Myers-Holum's incorrectly filed Motion for Summary Judgment.  [Filing No. 28.]

# I.
## EVIDENTIARY ISSUES

Ms. McNutt has objected to the admissibility of certain evidence presented by Myers-Holum in support of its Motion for Summary Judgment. Because the Court's rulings on the objections impact the evidence that the Court can consider on summary judgment, the Court turns first to the objections.

### A. Declaration of Myers-Holum's Chief Executive Officer Mark Myers

Ms. McNutt objects to Myers-Holum's reliance upon the Declaration of Mark Myers, Myers-Holum's Chief Executive Officer, arguing that the evidence is inadmissible. [Filing No. 36 at 5-6.] Ms. McNutt argues that the "affidavit fails to meet the standard required to defeat summary judgment, as mere self-serving affidavits without factual support are insufficient, per *Palmer v. Marion Cnty.*, 327 F.3d 588, 598 (7th Cir. 2003)." [Filing No. 36 at 6 (citing *Buie v. Quad/Graphics Inc.*, 366 F.3d 496, 504 (7th Cir. 2004)).] She argues that the "statements . . . lack corroborating evidence and rely solely on conclusory allegations," and that "[u]nder the principles set forth in *Hill v. Tangherlini*, 724 F.3d 965, 967-68 (7th Cir. 2013), to be admissible and create a genuine issue of material fact, affidavits must be based on specific facts and personal knowledge, which the affidavit in question fails to sufficiently demonstrate." [Filing No. 36 at 6.]

In response, Myers-Holum argues that Ms. McNutt "took no depositions in support of her case, so Myers-Holum included the Declaration of [Mr.] Myers to provide additional context." [Filing No. 38 at 4.] It asserts that Mr. Myers' Declaration "is based on his own personal knowledge and makes repeated references to documented evidence along with specific events in which he was directly involved" and that the cases Ms. McNutt cites are unavailing. [Filing No. 38 at 4.]

Federal Rule of Civil Procedure 56(c), which governs summary judgment, provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Hill*, 724 F.3d at 967-68 (explaining that Rule 56(c)'s requirements of personal knowledge and specific facts is the standard the court should apply when considering written testimony as evidence on summary judgment).

Ms. McNutt's challenge to the Declaration of Mr. Myers is meritless. The Declaration covers business matters within the personal knowledge of Mr. Myers, cites to evidence in the record including multiple emails and time records corroborating his personal knowledge and the specific facts he asserts, and verifies that—as the CEO of Myers-Holum—he is competent, to testify on the matters stated. [Filing No. 33-2.] Fed. R. Civ. P. 56(c)(4).

The cases cited by Ms. McNutt fail to support her argument. In *Palmer*, the court held that the plaintiff's self-serving affidavit was admissible but found that it did not constitute sufficient evidence to support his claim. 327 F.3d at 595-97. In *Buie*, the Seventh Circuit held that the district court erred in disregarding a party's self-serving affidavit at summary judgment and emphasized that an affidavit must be considered if it meets the evidentiary standards of Rule 56. 366 F.3d at 505-06. Likewise, in *Hill*, the Seventh Circuit found error in a district court's refusal to consider affidavits solely because they were self-serving. 724 F.3d at 967-68 (citations and footnote omitted). The court then reaffirmed that affidavits are admissible if based on personal knowledge and contain specific facts as required under Rule 56. *See id.*

In sum, Mr. Myers' Declaration satisfies the requirements set forth for affidavits in Rule 56(c)(4) and none of the cases cited by Ms. McNutt suggest that Mr. Myers' Declaration is

inadmissible.  Ms. McNutt's objection, [Filing No. 36 at 5-6], to Mr. Myers' Declaration is **OVERRULED**.

### B.  Declaration of Andrew Tai-Pow

Ms. McNutt objects to Myers-Holum's reliance upon the Declaration of Andrew Tai-Pow, the Director of Myers-Holum's NetSuite practice group, in its reply in support of its Motion for Summary Judgment.  [Filing No. 37; Filing No. 38; Filing No. 39.]  Ms. McNutt argues that Myers-Holum "improperly introduce[d]" Mr. Tai-Pow's Declaration because it was not included as evidence originally supporting its Motion for Summary Judgment.  [Filing No. 39.]

Myers-Holum did not response to Ms. McNutt's objection.

The failure to respond to an argument results in waiver.  *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *Greenbank v. Great Am. Assurance Co.*, 47 F.4th 618, 629 (7th Cir. 2022) (noting that courts "are not responsible for constructing the parties' arguments").  Because Myers-Holum's did not respond to Ms. McNutt's argument regarding Mr. Tai-Pow's Declaration, the Court **SUSTAINS** Ms. McNutt's objection, [Filing No. 39], and does not consider Mr. Tai-Pow's Declaration as evidence for the purposes of summary judgment.

## II.
### SUMMARY JUDGMENT STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of*

*Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party, including giving that party the benefit of conflicting evidence, and draws all reasonable inferences in that party's favor. *Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022); *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In

other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III.
#### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard detailed above and consistent with the Court's evidentiary rulings. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. Myers-Holum's Business

Myers-Holum is a business technology consulting firm that partners with business technology and software companies and helps clients implement and utilize those technology services and software infrastructures to improve their business. [*See* Filing No. 33-2 at 1-3; Filing No. 33-4.] It is headquartered in New York City but employs an entirely virtual workforce. [*See* Filing No. 33-2 at 1-3.] "No employee at Myers-Holum in the relevant timeframe worked at a location where Myers-Holum had at least 50 employees within a 75-mile radius." [Filing No. 33-2 at 2.] As a consulting firm, Myers-Holum expects "that team leaders and project managers . . . will bill the greater majority of their working time toward billable projects." [Filing No. 33-2 at 3.] "For varying reasons, that goal may not be met, but [team leaders and project managers] should ideally have a steady stream of billable work." [Filing No. 33-2 at 3.]

### B.  Myers-Holum Hires Ms. McNutt

Myers-Holum hired Ms. McNutt on October 25, 2021 as a part of its Stripe Practice as a Team Lead.  [Filing No. 33-1 at 5; Filing No. 33-3.]  Stripe is "a 90 billion dollar technology company that builds economic infrastructure for companies of all shapes and sizes."  [Filing No. 33-4 at 2.]  Stripe's software allows companies to receive payments online and "fundamentally manage their business with ease and visibility."  [Filing No. 33-4 at 2.]  "Myers-Holum is a chosen partner of Stripe and together, . . . collaborate[s] with Stripe and their customer's [(sic)] on implementing Stripe financial tools and internet infrastructure."  [Filing No. 33-4 at 2.]  Myers-Holum's Stripe Practice is managed by Lauren Karpf and is one of several practice groups within Myers-Holum.  [Filing No. 33-1 at 6; Filing No. 33-1 at 14.]  Other Myers-Holum practice groups include NetSuite, NetSuite Analytics Warehouse, and Data and Data Analytics.  [Filing No. 33-1 at 6.]

From her date of hire on October 25, 2021 until February 27, 2022, (about four months), Ms. McNutt billed only 148.25 hours because Stripe, who Ms. McNutt "had been hired to support, had changed certain aspects of what it needed from Myers-Holum, and [Ms. McNutt] lacked some of the requisite relevant experience to fully meet Stripe's needs."  [Filing No. 33-2 at 3.]

### C.  Ms. McNutt Transfers to a Special Billable Project

In February 2022, an opportunity arose for Ms. McNutt to work on a large special billable project for Dick's Sporting Goods ("DSG") ("DSG Project").  [Filing No. 33-1 at 8; Filing No. 33-2 at 3; Filing No. 33-6.]  The DSG Project was led and supervised by Myers-Holum Chief Technology Officer Dave Chu.  [Filing No. 33-1 at 7.]  Myers-Holum was "working on a data warehouse program with [DSG]" and "looking at [DSG's] data and analyzing [it] as well as trying to get [DSG] to understand data governance."  [Filing No. 33-1 at 8.]  Ms. McNutt was interested

in transitioning to the DSG Project because she found it interesting and not a type of project that she has worked on before. [Filing No. 33-1 at 8.] She "knew nothing about data. [She] taught [herself]. [Mr. Chu] recommended a couple of books. And [she] read them. And understood it. Learned how to do some data analyzing with the rest of the team and [she] found it very interesting. . . . So [she] was pretty excited about learning something new." [Filing No. 33-1 at 8 (Ms. McNutt's deposition testimony).] Myers-Holum Chief Executive Officer Mark Myers was also in favor of transitioning Ms. McNutt to the DSG Project as it "would provide her with a steady source of billable work." [Filing No. 33-2 at 3.]

Ms. McNutt transitioned to the DSG Project in late February 2022. [Filing No. 33-1 at 7.] Four other individuals also transitioned to the DSG Project: Dhatri Nagar, Ponshankar Palanivel, Priya Sharan, and Siddhartha Tripuraneni. [Filing No. 33-2 at 3; Filing No. 33-9 at 2-3.] Each of these four individuals transitioned to the DSG Project from the NetSuite Analytics Warehouse practice group, which was led by Knute Holum. [Filing No. 33-2 at 3; Filing No. 33-9 at 2-3.]

### D.  Mr. Chu Announces His Retirement

On September 27, 2022, Mr. Chu announced his retirement with an effective date of October 15, 2022. [Filing No. 33-2 at 3.]

### E.  Myers-Holum Hires an Experienced NetSuite Project Manager

On October 3, 2022, Myers-Holym hired an experienced NetSuite Project Manager who had over fifteen years' experience in the enterprise resource planning industry and professional services and oversaw more than thirty end to end NetSuite implementations. [Filing No. 35-1 at 11.]

**F.  Myers-Holum Is Notified that DSG Is Pausing Its Work with Myers-Holum**

In the morning on October 7, 2022, Ms. McNutt attended a weekly meeting with DSG regarding the DSG Project.  [Filing No. 33-1 at 10; Filing No. 33-8 at 3.]  After the meeting, DSG employee Liz Marsh, the DSG project manager working with Myers-Holum, asked Ms. McNutt to stay on the call after it formally ended.  [Filing No. 33-1 at 10; Filing No. 33-8 at 3.]  Ms. Marsh then informed Ms. McNutt that DSG was "not in a good place and want[ed] to pause and not sign [Statement of Work #4]"[2] and would be "doing a hard stop with [Myers-Holum] on October 14th, [and would] not be finishing the end to end testing."  [Filing No. 33-8 at 3; Filing No. 33-1 at 10.]  Ms. Marsh explained that "the [Myers-Holum] DSG team was way ahead of [DSG]," and that DSG was "trying to hire [its] own data analyst" to work on the data analyzation that Myers-Holum was assisting with and "wanted to do some catch up."  [Filing No. 33-1 at 10-11.]  Ms. McNutt was unsure of the status of the DSG Project after the meeting.  [Filing No. 33-1 at 11.]

Immediately after the meeting, Ms. McNutt emailed Mr. Chu, Darius Kemeklis, who helped Mr. Chu lead the DSG Project, and Mr. Holum, asking for a meeting with them to share what she learned from Ms. Marsh and "discuss next steps."  [Filing No. 33-8 at 2-3.]  Mr. Myers was also made aware of Ms. McNutt's email.  [*See* Filing No. 33-8 at 2.]  Mr. Myers understood that the DSG Project "would conclude based on [Mr.] Chu's retirement and the lack of analysts on DSG's end to keep up with [Myers-Holum's] work."  [Filing No. 33-2 at 4.]  In response to Ms. McNutt's email but without her copied on the email, Mr. Chu informed Mr. Myers, Mr. Kemeklis, and other leadership members that he did not think any of the DSG Project team members were contractors such that they would need to be put "on notice," but that they transitioned to the DSG

---

[2] A Statement of Work is an "actual document that explains what [Myers-Holum will] be doing for the [client]."  [Filing No. 33-1 at 8.]

Project from either the Stripe or NetSuite Analytics Warehouse practice groups. [Filing No. 33-8 at 2.]

### G. Myers-Holum Management Discusses Where to Reallocate the DSG Project Employees

On October 11, 2022 at 12:30 p.m., Mr. Chu emailed Mr. Myers and Mr. Holum regarding both Ms. McNutt and Mr. Tripuraneni from the DSG Project, explaining that both individuals "want to stay focused on the data side. If we can't find a billable place for them under [the NetSuite Analytics Warehouse practice group]," and that he was "willing to coach them through creating Data Classification Engine prototype for Mr. Holum." [Filing No. 33-15 at 3.]

From October 11, 2022 through October 17, 2022, Mr. Myers, Mr. Knute, Mr. Chu, and other Myers-Holum management discussed via email whether the NetSuite or the NetSuite Analytics Warehouse practice groups had billable work for Ms. McNutt and Mr. Tripuraneni and explored the idea of having both individuals work a special project to create a Data Classification Engine prototype, including discussing what the project would require and whether it was billable or non-billable. [Filing No. 33-15.] Also during this time, Mr. Myers "reviewed the potential to place [Ms. McNutt] back in [the Stripe practice group, led by Ms. Karpf]" and instructed Andrew Tai-Pow, Director of the NetSuite practice group, to interview Ms. McNutt as a potential member for the NetSuite practice group. [Filing No. 33-1 at 12; Filing No. 33-2 at 5; *see* Filing No. 33-9 at 2; *see* Filing No. 33-16.]

On October 14, 2022, Ms. Karpf informed Myers-Holum Vice President Sadie Perrotta that she did not think she "had room for her" in the Stripe practice group. [Filing No. 33-13.] Ms. Karpf explained that "[o]ur pipeline slowed down as deals aren't closing fast enough and current projects are ending. I'll take [Ms. McNutt], but I won't have many hours to bill." [Filing No. 33-13.] Mr. Myers was advised of the Stripe practice group's lack of billable work and concluded that

the Stripe practice group could not support Ms. McNutt's full return to the practice group.  [Filing No. 33-2 at 5.]  Also on this day, Ms. McNutt received a bonus of $15,000 as a part of her employment.  [Filing No. 33-1 at 4; Filing No. 33-14.]

On October 17, 2022, Mr. Holum advised Mr. Myers that he "did not believe [Ms. McNutt] would be effective for supporting [the NetSuite Analytics practice group's] projects."  [Filing No. 33-2 at 5; *see* Filing No. 33-15; Filing No. 33-16.]  As for the Data Classification Engine prototype project, after consideration of its requirements Mr. Myers concluded that was not a feasible project for Ms. McNutt because it "would take . . . far too much unbillable time."  [Filing No. 33-2 at 5.]

### H. Ms. McNutt Is Interviewed for Work in the NetSuite Practice Group

Before Mr. Tai-Pow interviewed Ms. McNutt, he told Ms. Perrotta that he did not know what to interview Ms. McNutt for "given her background."  [Filing No. 33-12 at 3.]  Ms. Perrotta told Mr. Tai-Pow that Mr. Myers "said [Ms. McNutt] needs to find a home" and that "she seems like she wants to stay in data and analytics [b]ut [Ms. Perrotta did not] know [if] that it's an option." [Filing No. 33-12 at 3.]  Mr. Tai-Pow then asked Ms. Perrotta whether Ms. McNutt was aware "that the writing is on the wall in data and analytics, or [was] she under the impression that there is continued work?"  [Filing No. 33-12 at 2.]  Ms. Perrotta indicated that Ms. McNutt thought that there was still some work left for the DSG Project and that DSG would start back up with Myers-Holum the next year, and told Mr. Tai-Pow that she thought Ms. McNutt was "in a bit of denial" regarding the DSG Project and thought that DSG did not have enough work for full allocation. [Filing No. 33-12 at 2.]

Mr. Tai-Pow interviewed Ms. McNutt for a project manager position in the NetSuite practice group.  [*See* Filing No. 33-1 at 15; Filing No. 33-16.]  After the interview on October 17, 2022, Mr. Tai-Pow told Mr. Myers that he:

liked [Ms. McNutt] as a person but unsure about transferrable skills. She doesn't have a lot of direct experience that would translate perfectly into a [project manager] role with us. I would prefer not to bring her onboard . . . , as we are currently rejecting people of similar caliber in external [project manager] recruiting. There will be a lot of learning and ramp up required.

[Filing No. 33-16 at 2.]

### I.  Mr. Myers Concludes that Myers-Holum Does Not Have Work for Ms. McNutt

In response to Mr. Tai-Pow's answer above, Mr. Myers told Director of Human Resources Kelly Fox and Director of Global Talent Ashley Swanson "we are going to have to ou[t] place [Ms. McNutt] and others from [DSG]" and scheduled a call with Mr. Holum to discuss his decision to terminate Ms. McNutt.  [Filing No. 33-2 at 5; Filing No. 33-16 at 2-3.]

### J.  Ms. McNutt Asks for an FMLA Form

On October 19, 2022, Ms. McNutt told Ms. Karpf that she was going to file for FMLA leave.  [Filing No. 33-1 at 16.]  Ms. Karpf "asked [Ms. McNutt] what FMLA was and [Ms. McNutt] told her" and said that it had been "nearly a year [of employment with Myers-Holum[3]] and [that she] always file[s] FMLA."  [Filing No. 33-1 at 16.]  Ms. McNutt knew that her one-year mark was still "a couple of days" away.  [Filing No. 33-1 at 11.]

On October 20, 2022, Ms. McNutt messaged with Human Resources employee Petra Radakovic:

> **Ms. McNutt:** One more question, do we have a FMLA form that I can fill out?
>
> **Ms. Radakovic:** I believe you do it through your state's government website, but let me get back to you on that.
>
> **Ms. McNutt:** I just downloaded the form, so if you will take it, I will have it filled out and send it back to you, if that is okay.  It is a sporadic FMLA, just in case.
>
> **Ms. Radakovic:** [S]o you're not taking FMLA, you just want me to hold onto it so the form is ready should something happen?

---

[3] Ms. McNutt was hired on October 25, 2021.  [Filing No. 33-3.]

12

**Ms. McNutt:** I think it is called Sporadic – FMLA, meaning I get so much time if needed, but quite honestly never have used it. I have a medical condition that is serious with no cure, but never have used it, but have been told to have one just in case. I guess I get so many hours a year to take, if needed, don't plan on it and do not take sick leave either! The one time I don't have it is when I should need it, right? Murphy's law . . . so covering all my options.

**Ms. Radakovic:** [O]k absolutely, send it over to hr@myersholum.com.

**Ms. McNutt:** Will do! Should have it completed by next week. [A]ppreciate it!

**Ms. Radakovic:** [O]f course! [A]lso, it's intermittent FMLA although sporadic makes sense.

**Ms. McNutt:** Yes, that it is. Intermittent – Sporadic. [C]lose – LOL.

**Ms. Radakovic:** [L]ol I had to google it so at least you were in the ballpark.

[Filing No. 33-17 at 6-7.]

### K.  Mr. Myers Instructs Ms. Fox to Terminate Ms. McNutt

On October 21, 2022 at 4:40 a.m., Mr. Myers sent an email to Ms. Fox, Ms. Swanson, Ms. Perrotta, Mr. Holum, and Mr. Kemeklis instructing Ms. Fox to "[p]lease terminate [Ms. McNutt] today and give her 30 days severance." [Filing No. 33-18.] He explained that "we simply don't have the work for her with [the DSG Project] ending." [Filing No. 33-18.]

On October 21, 2022 at 8:38 a.m., Ms. Perrotta messaged Ms. Karpf that "[Mr. Myers] emailed me this AM to term[inate] her." [Filing No. 33-20.] Ms. Karpf responded: "Oh Good I need to tell you something about her[.] Hang up this call and call my cell[.] It's legal." [Filing No. 33-20.]

### L.  Mr. Myers Learns that Ms. McNutt Inquired About FMLA Forms

Later on October 21, 2022, Mr. Myers learned "for the first time that [Ms. McNutt] had inquired about FMLA with [Ms.] Radakovic of Human Resources . . . [and] requested an FMLA

form."[4]  [Filing No. 33-2 at 6.]  This was also the first time that Mr. Myers knew that Ms. McNutt "had any medical condition whatsoever." [Filing No. 33-2 at 6.]  He then called Ms. Fox and asked her to effectuate the termination the following Monday, October 24, 2022." [Filing No. 33-2 at 6.]

### M. Ms. McNutt Is Terminated and Fills Out FMLA Forms

On October 24, 2022 at 4:15 p.m., Ms. Fox terminated Ms. McNutt's employment. [Filing No. 33-1 at 17; Filing No. 33-19.]  Ms. McNutt asked why, and she was told that it was because of "billable hours." [Filing No. 33-1 at 17.]  From February 28, 2022 through October 24, 2022, "[e]ssentially all" of Ms. McNutt's billable work from came from the DSG Project. [Filing No. 33-2 at 3.]

This same day, Ms. McNutt was working with her doctor to fill our the FMLA forms. [*See* Filing No. 33-21 at 3.]  Ms. McNutt's doctor signed the FMLA forms on October 25, 2022. [Filing No. 33-21 at 6.]  Ms. McNutt scanned her completed FMLA paperwork and medical documentation to Myers-Holum on October 31, 2022. [Filing No. 33-21 at 2.]  Ms. McNutt indicated that the condition for which she sought leave was Psoriatic Arthritis. [Filing No. 33-1 at 16.]

---

[4] Ms. McNutt disputes Mr. Myers' testimony that he only learned of her medical condition on October 21, 2022. [Filing No. 36 at 5.]  However, the evidence that Ms. McNutt cites in support of her dispute about when Mr. Myers learned of her medical condition/FMLA inquiry is her testimony that she was terminated after "confid[ing] in HR about an ADA disability" in violation of the ADA and FMLA. [Filing No. 36 at 5 (citing Filing No. 33-1 at 22).]  The cited evidence does not mention or allude to Mr. Myers or the timing of when he became aware of Ms. McNutt's FMLA questions to Ms. Radakovic or Ms. McNutt's conversation with Ms. Karpf. [Filing No. 33-1 at 22; Filing No. 36 at 5.]  This evidence does not support the presence of a genuine dispute about the timing of Mr. Myers' knowledge. Fed. R. Civ. P. 56(c)(1); (e).

### N.  The DSG Project and the Other DSG Project Members

"In the intermediate aftermath of the DSG [P]roject ending," Myers-Holum retained DSG Project members Mr. Nagar, Mr. Tripuraneni, and Ms. Sharan, "as [it] was able to place them on different projects given their experience level." [Filing No. 33-2 at 4.]  All three individuals "had experience with NetSuite or NetSuite Analytics Warehouse [practice groups] that allowed them to more easily transition to other work within Myers-Holum." [Filing No. 33-2 at 4.]  Myers-Holum was not able to retain Mr. Palanivel due to not having enough projects where he could "bill any significant amount of time." [Filing No. 33-2 at 4.]  Mr. Palanivel was terminated in November 2022. [Filing No. 33-2 at 4.]  Only one individual, Mr. Nagar, billed to the DSG Project after Ms. McNutt's termination. [Filing No. 35-1 at 10.]  He performed 1.5 hours of work on December 8-9, 2022. [Filing No. 35-1 at 10.]

### O.  Myers-Holum Hires NetSuite Project Managers

On November 1, 2022, Myers-Holum hired a project manager who had three years' experience in NetSuite project management, "with 13 successful go-lives and 8 more at the time underway" and "[e]xperience with NetSuite SuiteSuccess methodology and end-to-end project management." [Filing No. 35-1 at 11.]

On November 8, 2022, Myers-Holum hired another project manager who had experience leading implementation of three large NetSuite projects, among other accomplishments. [Filing No. 35-1 at 11.]

On January 9, 2023, Myers-Holum hired a project manager with ten years' experience in "systems implementation," and experience with NetSuite, including as a project manager for one NetSuite implementation and as a conductor of NetSuite training. [Filing No. 35-1 at 11.]

On January 17, 2023, Myers-Holum hired a project manager who had experience as a NetSuite consultant, was fully NetSuite certified, and had been involved in fifty NetSuite projects, leading half of them. [Filing No. 35-1 at 11.]

**P. This Lawsuit**

On August 28, 2023, Ms. McNutt filed this lawsuit asserting three claims against Myers-Holum: (1) disability discrimination in the form of failure to accommodate in violation of the ADA; (2) disability discrimination in the form of disparate treatment (terminating her "based on her disability") in violation of the ADA; and (3) retaliation in violation of the FMLA due to "her attempt to exercise her rights under the FMLA." [Filing No. 1; Filing No. 25 (Ms. McNutt's Statements of Claims).][5]

**Q. Ms. McNutt's Testimony Regarding Her Psoriatic Arthritis**

Ms. McNutt testified in this matter that her Psoriatic Arthritis is "pretty painful and [that she has] episodes." [Filing No. 33-1 at 18.] She described that "[i]t's two diseases in one. So my joints are affected as well as my skin." [Filing No. 33-1 at 18.] Since 2004, she has not had to miss a day of work due to her Psoriatic Arthritis. [Filing No. 33-1 at 18.] She has Psoriatic Arthritis flare-ups "[p]retty much every day," but it has not impacted her ability to work, and she

---

[5] Ms. McNutt's Complaint alleges that her second claim is for both "ADA discrimination and retaliation," [Filing No. 1 at 5-6], but in her Statement of Claims, she frames this claim as only one for ADA discrimination and does not mention an ADA retaliation claim whatsoever, [Filing No. 25]. Ms. McNutt's claims and theories are limited to those set forth in her Statement of Claims. [Filing No. 25.] *See Jackson v. Regions Bank*, 838 F. App'x 195, 198 (7th Cir. 2021) (finding "no abuse of discretion in the district court's enforcement of its requirement that [the plaintiff] specifically state [her] theories of relief" in the Statement of Claims). In any event, the analysis of an ADA retaliation claim overlaps with the analysis of an FMLA retaliation claim, which the Court analyzes below. *Trahanas v. Northwestern Univ.*, 64 F.4th 842, 856 (7th Cir. 2023) (analyzing FMLA and ADA retaliation claims together and noting that "[t]he FMLA and ADA are legally distinct, but in cases claiming unlawful retaliation, the analyses . . . overlap.") (quotations and citation omitted).

usually will alternate between sitting and standing while working because "[s]itting for a long time hurts." [Filing No. 33-1 at 18 (Deposition testimony of Ms. McNutt).]

# IV.
## DISCUSSION

### A.  ADA Discrimination Claims

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  "The ADA then defines 'discriminate against a qualified individual on the basis of disability' to include disparate treatment and failure to accommodate: 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee.'" *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (emphasis omitted) (quoting 42 U.S.C. § 12112(b)(5)(A)).  Ms. McNutt asserts both disparate treatment and failure to accommodate claims under the ADA, and the Court addresses each claim in turn.

### 1.  Failure to Accommodate Claim

Myers-Holum argues that Ms. McNutt's failure to accommodate claim fails as a matter of law because Ms. McNutt cannot prove any of the elements necessary to establish a prima facie claim. [Filing No. 34 at 13-17.]  It contends that she is not disabled under the ADA, that Myers-Holum was not aware of any disability, and that Ms. McNutt's communication with Ms. Radakovic "is woefully insufficient" to place Myers-Holum "on notice of any actual disability or the need to accommodate." [Filing No. 34 at 15.]  It highlights that Ms. McNutt unambiguously told Ms. Radakovic that she was seeking FMLA certification only if she needed it in the future and that she did not plan on ever using it. [Filing No. 34 at 15.]  Myers-Holum emphasizes that Ms. McNutt

testified that "she did not want Myers-Holum to accommodate her at that time; rather, she only sought unpaid leave under the FMLA as an accommodation should she ever need it." [Filing No. 34 at 15 (citing Filing No. 33-1 at 18-21).] It also argues that Ms. McNutt's Complaint "makes perfectly clear there was no actual request under the ADA," only the FMLA, and argues that an FMLA request does not check the box for an ADA reasonable accommodations request. [Filing No. 34 at 16 (citations omitted).]

Ms. McNutt argues that Myers-Holum's "lack of response to [her] documented medical condition and explicit requests for accommodation demonstrates a failure to fulfill its [ADA] obligations," which precludes summary judgment. [Filing No. 36 at 12.] She argues that she "communicated her need for accommodation, disclosing her disability and seeking information regarding FMLA leave" and that Myers-Holum's response was insufficient to engage in the required interactive process. [Filing No. 36 at 13.] She contends that her request for an FMLA form triggered Myers-Holum's obligations under the ADA and that "the internal communications between senior management, which took place shortly after [her] accommodation request, indicate that [Myers-Holum] was aware of her medical condition" and that despite the awareness, it "chose to terminate [her] without any discussion of possible accommodations." [Filing No. 36 at 14.]

In reply, Myers-Holum reiterates that Ms. McNutt "has introduced no evidence that she is disabled," which is a required element under an ADA claim, and argues that Ms. McNutt did not even attempt to rebut its argument that she failed to establish a disability. [Filing No. 38 at 12.] Myers-Holum asserts that Ms. McNutt's conversation with Ms. Radakovic did not mention the ADA, did not even mention a disability, and that there is no evidence or testimony that Ms. McNutt ever disclosed her specific medical condition to anyone at Myers-Holum. [Filing No. 38 at 14.] It also reiterates that Myers-Holum made its termination decision before Ms. McNutt messaged

with Ms. Radakovic about an FMLA form and that Mr. Myers did not know that Ms. McNutt asked about an FMLA form "until he had twice communicated his decision" to terminate her. [Filing No. 38 at 14.]

"[T]o establish a claim for failure to accommodate, a plaintiff must show that: (1) [s]he is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Schoper v. Bd. of Trs. of W. Ill. Univ.*, 119 F.4th 527, 532 (7th Cir. 2024) (citation omitted).

### a.  <u>Qualified Individual with a Disability</u>

A disability is defined under the ADA as: (a) a physical or mental impairment that substantially limits one or more major life activities of the individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(1).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.*

Ms. McNutt does not address whether, or even attempt to argue that, she is disabled beyond a mere conclusory statement[6] that she is disabled, presumably because Ms. McNutt's own testimony—which she does not confront—dooms such an argument:

**Q (from Myers-Holum):** Psoriatic arthritis.  How does that affect your life?

---

[6] The Court could end the discussion right here because "Seventh Circuit precedent is clear that perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived." *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) (internal quotations and citation omitted).  Ms. McNutt's one-sentence non-supported statement that she is disabled meets such a classification.  Nevertheless, in the interest of justice and thoroughness, the Court goes on to provide a more searching analysis.

**A (from Ms. McNutt):** It's pretty painful and I have episodes.  So I could be free and clear.  It's two diseases in one.  So my joints are affected as well as my skin.

**Q:** And you said you haven't had to miss work for it yet?

**A:** No.

**Q:** Okay.  What does it limit?

**A:** What do you mean by that?  More specific.

**Q:** You said it's painful?

**A:** Yes.

**Q:** What does it limit in terms of your activities?  What can't you do?

**A:** I persevere.  Just keep pushing on.

**Q:** Okay.  How often do you have flare-ups?

**A:** Pretty much every day.

**Q:** Okay.  But it has not impacted your ability to work in any way?

**A:** No.

**Q:** Can you like if you're working do you sit or stand usually?

**A:** I do a little of both.  Sitting for a long time hurts so.

**Q:** Okay.  Is it because of the arthritis it hurts?

**A:** Yes.

**Q:** And so sometimes you'll stand?

**A:** Correct.

**Q:** Do you have a standing desk?

**A:** No.

**Q:** Okay. Are you able to work standing?

**A:** Yes.

**Q:** Okay.  Myers-Holum wouldn't care if you sit or stood.  Right?

**A:** Correct.

[Filing No. 33-1 at 18.]   Further, Ms. McNutt's conclusory statement that she "is a qualified individual with one or more disabilities, has a record of disability, and/or is regarded as disabled by [Myers-Holum]" cites only to her Complaint which alleges the same.  [Filing No. 36 at 6.]  Ms. McNutt's Complaint contains mere allegations—not facts—and nowhere else does she assert facts or cite to any evidence in the record regarding how her Psoriatic Arthritis substantially limits any major life activity.  This lackluster showing is insufficient on summary judgment.  Fed. R. Civ. P. 56(a); *King*, 872 F.3d at 840 ("summary judgment is not a time to be coy") (quotations and citation omitted); *Johnson*, 325 F.3d at 901 (on summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events); *Grant*, 870 F.3d at 572-73 (the Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant) (quotations omitted).  Stated differently, "parties are required to put their evidentiary cards on the table" at summary judgment, *Sommerfield*, 863 F.3d at 649, yet Ms. McNutt has failed to put any cards on the table when it comes to proving that she is disabled under the ADA.  Her prima facie case therefore fails at the first element, and the Court need not address the parties' arguments regarding the other prima facie elements.

Myers-Holum's Motion for Summary Judgment is **GRANTED** to the extent that the Court finds that Myers-Holum is entitled to summary judgment on Ms. McNutt's ADA failure to accommodate claim because no reasonable factfinder could return a favorable verdict for Ms. McNutt considering her lack of evidence regarding being disabled under the ADA.

        2.   *Disparate Treatment Claim*

Myers-Holum argues that an ADA disparate treatment claim also requires evidence of a disability as defined under the ADA and that Ms. McNutt has produced no evidence that she has a disability within the meaning of the ADA. [Filing No. 34 at 19.] It also argues that she did not suffer an adverse action because of a disability because Myers-Holum was not aware of any disability when it made the decision to terminate her. [Filing No. 34 at 19-20.] Myers-Holum argues that Ms. McNutt cannot point to a similarly situated employee who was treated more favorably because she "was fundamentally different than her peers because she lacked comparable experience in NetSuite and/or [the NetSuite Analytics Warehouse]." [Filing No. 34 at 20.] It also asserts that Ms. McNutt cannot show that its legitimate, non-discriminatory basis for her termination was pretextual. [Filing No. 34 at 20-21.]

Ms. McNutt asserts mostly the same arguments from her failure to accommodate claim. [Filing No. 36 at 12-18.] She further argues with respect to her disparate treatment claim that Myers-Holum's "justification of lack of available work was pretextual and contradicted by the record." [Filing No. 36 at 15.] Ms. McNutt asserts that "[t]he evidence demonstrates that [she] was actively engaged in ongoing projects at the time of her termination, [that Myers-Holum] provided inconsistent explanations, and [that it] hired a replacement shortly after" her termination, which "collectively indicate that the proffered reason was not the true motivation behind [her] termination and suggest[s] . . . discriminatory intent." [Filing No. 36 at 15.]

In reply, Myers-Holum reiterates that Ms. McNutt has produced no evidence that she was disabled as defined by the ADA. [Filing No. 38 at 12.] Regarding pretext, it argues that she has produced "no evidence of pretext whatsoever," that "[t]erminating someone because a project concludes is not evidence of pretext," and highlights that it tried to find a suitable position for her

but that the limited work available and her experience did not match up.  [Filing No. 38 at 16.] Myers-Holum also highlights that several of Ms. McNutt's assertions regarding purported evidence in this case lack any citation to the record.  [Filing No. 38 at 16-20.]

"To prevail on a disability discrimination claim [under the ADA], a plaintiff must show (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) she suffered an adverse employment action; and (4) the adverse action was caused by her disability." *Schoper*, 119 F.4th at 534 (quotations and citations omitted).  "At this stage, our task is straightforward: we ask whether the evidence, taken in the light most favorable to [Ms. McNutt], would allow a reasonable factfinder to conclude that disability caused her termination." *Id.* (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

Here, Ms. McNutt's disparate treatment fails for the same reason as her failure to accommodate claim.  She has failed to argue and produce evidence from which a reasonable jury could conclude that she was disabled within the meaning of the ADA.  Therefore, the Court **GRANTS** Myers-Holum's Motion for Summary Judgment as to Ms. McNutt's ADA discrimination claim in the form of disparate treatment.

### B. FMLA Retaliation Claim

Myers-Holum argues that Ms. McNutt's FMLA retaliation claim fails because there is no evidence of causation because it made its termination decision before she requested an FMLA form and before Mr. Myers knew that she requested an FMLA form.[7] [Filing No. 34 at 27-29.]

In response, Ms. McNutt argues that the "temporal proximity between [her] protected activity and termination," along with "the absence of performance warnings, [Myers-Holum's] shifting justifications, and comparator evidence," is evidence that she was terminated in retaliation for asking about FMLA leave. [Filing No. 36 at 9.] She argues that Ms. Karpf's message instructing Ms. Perrotta to call her to discuss something "legal" concerning Ms. McNutt "provides a strong indication of retaliatory intent." [Filing No. 36 at 11 (citation omitted).] She contends that Myers-Holum's explanation that she was terminated due to a lack of billable work available is "contradicted by internal emails and project summaries," and the fact that Myers-Holum hired a project manager two weeks after her termination for a similar role. [Filing No. 36 at 11-12.]

In reply, Myers-Holum argues that Ms. McNutt did not address its argument that the facts show that the termination decision was made prior to her FMLA inquiry and before Mr. Myers knew of her inquiry, which under its cited caselaw, dooms Ms. McNutt's claim. [Filing No. 38 at 12.] It contends that, regardless of Ms. McNutt's lack of acknowledgement of the timing, "mere temporal proximity is not enough to establish a genuine issue of material fact." [Filing No. 38 at 9 (citation omitted).] It argues that Ms. McNutt's argument regarding her lack of performance

---

[7] Myers-Holum raises other arguments regarding Ms. McNutt's eligibility for FMLA protections, including that she was not eligible because she had not yet been employed for a year. [Filing No. 34 at 23-26.] Despite Ms. McNutt's wholesale failure to respond to Myers-Holum's eligibility arguments, which appear to have some merit, the Court assumes without deciding that Ms. McNutt qualified as an FMLA-eligible employee under 29 U.S.C. § 2611 given that other issues are more clearly dispositive of Ms. McNutt's claim.

issues is confusing as it never suggested that her actual performance played any role in her termination and that the facts show that she was not similarly situated to her peers (one of which also worked on the DSG Project and was also terminated) because she lacked comparable experience in NetSuite to transition to the NetSuite or NetSuite Analytics Warehouse practice groups. [Filing No. 38 at 10-11.] It asserts that Ms. Karpf's message about discussing something "legal" is not problematic or evidence of retaliatory intent. [Filing No. 38 at 11.]

A retaliation claim requires proof of three elements: "(1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Trahanas*, 64 F.4th at 856 (quotations and citation omitted). To succeed in showing causation, a plaintiff must demonstrate that the protected conduct was a substantial or motivating factor in the employer's decision. *Id.* (quotations and citation omitted).

Here, Ms. McNutt's claim rests on whether she has presented sufficient evidence from which a jury could conclude that her FMLA inquiry was a substantial or motivating factor in Myers-Holum's decision to terminate her—*i.e.*, whether her FMLA inquiry caused her termination. Taken in the light most favorable to Ms. McNutt, the evidence reveals that Mr. Myers made the decision to terminate her on October 17, 2022, after it became evident that the DSG Project did not have continued work and after an inability to place her on another team or practice group and— crucially—before Ms. McNutt mentioned FMLA to either Ms. Karpf (on October 19, 2022) or Ms. Radakovic (on October 20, 2022). [Filing No. 33-1 at 16; Filing No. 33-8; Filing No. 33-9; Filing No. 33-15; Filing No. 33-16; Filing No. 33-17 at 6-7.] Therefore, Ms. McNutt's "temporal proximity" argument ignores the evidence and is meritless. When an employer's decision to terminate an employee predates the employee's FMLA leave request, there is no evidence from

which a "reasonable jury could find that [the employee] was terminated *because* of her FMLA request." *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018) (emphasis in original) (citing *Ennin v. CNH Indus. Am., LLC,* 878 F.3d 590, 597 (7th Cir. 2017) (district court properly entered summary judgment in employer's favor on FMLA retaliation claim where employer decided to terminate employment before employee had requested FMLA leave)); *Guzman v. Brown Cnty.*, 884 F.3d 633, 640 (7th Cir. 2018) (same); *DellaValle-Jones v. Xerox Corp.*, 2022 WL 972662, at *11 (S.D. Ind. Mar. 21, 2022) (same); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned [employment actions] upon discovering that [the employee filed an employment lawsuit], and their proceedings along lines previously contemplated, though not yet definitely determined, is no evidence [whatsoever] of causality."); *Salameh v. Sears Holding Mgmt. Corp.*, 2010 WL 183361, at *7 (N.D. Ill. Jan. 13, 2010) ("The FMLA is a shield to prevent an employer from acting pursuant to a prohibited animus, it is not a sword with which employees can disrupt their employer's non-actionable decisions.")

Moreover, Ms. McNutt does not dispute that Mr. Myers made the decision to terminate her yet has offered no evidence to contradict the evidence that shows that Mr. Myers did not know that she inquired about FMLA leave when he made that decision. Again, her lack of evidence is fatal. Fed. R. Civ. P. 56; *Stephens v. Erickson*, 569 F.3d 779, 788 (7th Cir. 2009) ("Clearly, a superior cannot retaliate against an employee for a protected activity about which he has no knowledge."); *Trahanas*, 64 F.4th at 857 ("Without knowledge of [plaintiff's] FMLA leave, hiring decisionmakers at [the employer] could not have retaliated against her for that leave."); *Sears, Roebuck & Co. v. NLRB,* 349 F.3d 493, 513, 515 (7th Cir. 2003) (reasoning that a decision cannot be motivated by what the decisionmaker does not yet know).

26

As to Ms. McNutt's argument regarding an absence of performance warnings, this argument is a red herring and meritless as there is no evidence that Myers-Holum terminated her due to performance issues—nor does Ms. McNutt even allege so.  Further, despite asserting that Myers-Holum provided "shifting justifications" for Ms. McNutt's termination, Ms. McNutt cites to no evidence in support of this argument nor expands on this argument, which is fatal.  [Filing No. 36 at 9-11.]  Fed. R. Civ. P. 56(e)(2); *Grant*, 870 F.3d at 572-73 (the court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant) (quotations omitted).  In any event, the only justification visible in the evidence is that the DSG Project was ending (only 1.5 hours were billed to DSG after its notification to Myers-Holum that it was not moving forward with the DSG Project) and there was no other full time work available at Myers-Holum appropriate for Ms. McNutt's experience.  [Filing No. 33-2 at 5; Filing No. 33-9 at 2; Filing No. 33-15; Filing No. 33-16; Filing No. 33-18; Filing No. 35-1 at 10.]

Lastly, Ms. McNutt's argument regarding the hiring of a project manager shortly after her termination ignores the fact that the individual hired had three years' experience in NetSuite project management, "with 13 successful go-lives and 8 more at the time underway" and "[e]xperience with NetSuite SuiteSuccess methodology and end-to-end project management."  [Filing No. 35-1 at 11.]  That individual's background is not comparable to Ms. McNutt and in no way lends credence to her argument regarding retaliatory causation.  [*See* Filing No. 33-10 (Ms. McNutt's

27

resume, which lacks any mention of NetSuite experience).][8]  And the conversation between Ms. Karpf and Ms. Perrotta after Ms. Perotta shared that Ms. McNutt would be terminated is not problematic in light of the lack of any other evidence supporting Ms. McNutt's claim.  It is not surprising or concerning that Ms. Karpf might want to alert senior management about Ms. McNutt's statement to her that she was interested in filing for FMLA leave upon learning that Myers-Holum planned to terminate her.

In sum, Ms. McNutt has failed to present sufficient evidence from which a jury could conclude that her FMLA inquiry was a substantial or motivating factor in Myers-Holum's decision to terminate her.  The Court therefore **GRANTS** Myers-Holum's Motion for Summary Judgment as to Ms. McNutt's FMLA retaliation claim.

## V.
### CONCLUSION

When the project that Ms. McNutt billed most of her time to while employed at Myers-Holum effectively ended, Myers-Holum attempted to reallocate her to other work, but due to the amount of work available for someone with her experience, Myers-Holum was unable to retain Ms. McNutt and terminated her employment.  This decision was made before Ms. McNutt inquired regarding FMLA leave and there is no evidence that the decision to terminate Ms. McNutt was for any reason other than a lack of available work for someone with her experience.  Further, Ms.

---

[8] Ms. McNutt includes evidence in her Statement of Material Facts in Dispute in her response that Myers-Holum had hired four more project managers after her termination, but she does not cite or otherwise reference this evidence in any of her arguments.  [Filing No. 36 at 3; *see generally* Filing No. 36 at 9-18.]  Undeveloped arguments are waived.  *Anderson v. Street*, 104 F.4th 646, 654 n.3 (7th Cir. 2024) (citing *Greenbank*, 47 F.4th at 629 (noting that courts "are not responsible for constructing the parties' arguments")).  Despite not developing an argument regarding these individuals, the Court notes that the undisputed evidence reveals that all individuals had significant NetSuite experience similar to the individual hired shortly after Ms. McNutt's termination.  [Filing No. 35-1 at 11; *see* Filing No. 33-10.]

McNutt has not put forth any evidence that she is disabled such that she could have viable claims under the ADA. Based on the undisputed facts, Ms. McNutt's claims fail as a matter of law, and for the foregoing reasons, the Court:

- **DENIES** Myers-Holum's first incorrectly filed Motion for Summary Judgment, [28], **AS MOOT**;

- **OVERRULES** Ms. McNutt's objection, [36], to Mr. Myers' Declaration;

- **SUSTAINS** Ms. McNutt's objection, [39], to Mr. Tai-Pow's Declaration; and

- **GRANTS** Myers-Holum's Motion for Summary Judgment, [33].

Final judgment shall enter accordingly.

Date: 2/11/2025

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF to all counsel of record**